IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

KEG TECHNOLOGIES, INC., and )
KURT HÖRGER )
      Plaintiffs, )
            )    CIVIL ACTION
VS. )
            )    FILE NO. 1:04-CV-0253 RWS
REINHART LAIMER, SEWER )
EQUIPMENT CORPORATION, and )
LAIMER UNICON, LLC, and )
SMK ROHRSDORF GmbH )
      Defendants. )

## BRIEF IN SUPPORT OF LAIMER DEFENDANTS' 55(c) MOTION TO SET ASIDE CLERK'S ENTRY OF DEFAULT AND MOTION FOR RECONSIDERATION OF ORDER GRANTING MOTION FOR DEFAULT JUDGMENT

COME NOW, Defendants Reinhart Laimer ("Laimer" or "Mr. Laimer"), Sewer Equipment Corporation ("SEC"), Laimer Unicon, LLC ("Laimer Unicon") (collectively, the "Laimer Defendants") and file this Rule 55(c) Motion to Set Aside Clerk's Entry of Default and Motion to Reconsider Order Granting Motion For Default Judgment, showing the Court as follows:

### I. INTRODUCTION AND BACKGROUND

At its core, this case involves a personality conflict between Plaintiff Hörger and Defendant Laimer and the eventual breakup of their business. Defendant Laimer, who built Plaintiff KEG from nothing into a thriving business, is not the conniving wrongdoer that is portrayed in Plaintiffs' pleadings and briefs. Rather he is a hardworking man who cared about quality and pleasing his customers. Accompanying this brief is Defendant Laimer's Affidavit which is adopted and incorporated herein in its entirety. Mr. Laimer

addresses the claims against him and gives a clear account of how the relationship between him and Mr. Horger deteriorated.  Mr. Laimer recognizes the seriousness of this matter and affirms his respect for this tribunal's rules and orders.

## II.  <u>ARGUMENT AND CITATION OF AUTHORITY</u>

A.  **GOOD CAUSE EXISTS TO SET ASIDE THE ENTRY OF DEFAULT.**

1.  **Defaults are generally disfavored.**

Under FRCP 55(a), a default may be entered when "a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules."  "Default judgments, however, are generally disfavored by the law."  <u>Reiffen v. Microsoft Corp.</u>, 158 F. Supp. 2d 1016, 1031 (2001).  "Cases should be decided upon their merits whenever reasonably possible."  <u>Eitel v. McCool</u>, 782 F.2d 1470, 1472 (9th Cir. 1986).  Because of this preference, "doubts should be resolved in favor of the defaulting party."  <u>Enron Oil Corp. v. Diakuhara</u>, 10 F.3d 90, 95-96 (2nd Cir. 1993).  A default is a "drastic remedy and should be resorted to only in <u>extreme</u> situations."  <u>E.F. Hutton & Co., Inc. v. Moffat</u>, 460 F.2d 284, 285 (5th Cir. 1972) (emphasis added).

Under FRCP 55(c), a default may be set aside a default "for good cause shown."  Courts generally focus on three factors: "(1) whether the default was culpable or willful; (2) whether granting the motion to set aside the default would prejudice the non-defaulting party; and (3) whether the party in default has a meritorious defense."

<u>Ritts v. Dealers Alliance Credit Corp.</u>, 989 F. Supp. 1475, 1480 (N.D.Ga. 1997).  The Rule 55(c) standard, however, is more liberal than the strict standard to vacate a final default judgment under Rule 60(b).  See <u>FDIC v. Francisco Inv. Corp.</u>, 873 F.2d 474, 478 (1st Cir. 1989).

**2.   Factor 1 - The Laimer Defendants' Default Was Not Wilful.**

The first factor concerns wilfulness.  Wilfulness is viewed in light of the defaulting party's intent.  "When defendants have indicated an intent to defend the action, default should not be entered."  <u>Reiffen</u>, 158 F. Supp. at 1031 (emphasis added).  The Laimer Defendants have unequivocally demonstrated their intent to defend this lawsuit.  Plaintiffs filed their Complaint on January 29, 2004 [D1].[1]  The Laimer Defendants, represented by Mr. Herbert, appeared and defended at the Injunction hearing on February 13, 2004 (Defendant Laimer testified at this hearing) [<u>see</u> D9].  The Laimer Defendants filed their answer on February 17, 2004 [D12].  On March 1, 2004, the Laimer Defendants stipulated to allow Plaintiffs to Amend their Complaint [D17].  That same day, Plaintiffs filed their Amended Complaint [D18], slightly modifying a few factual allegations and adding SMK as a party.  The amended allegations, however, do not alter the meaning of the original Complaint or the claims against the Laimer Defendants.  A chart comparing Plaintiffs' Complaint, The

---

[1]      "[D1]", etc. is a docket reference number.

Laimer Defendants' Answer, Plaintiffs' Amended Complaint, and
Plaintiffs' Second Amended Complaint is attached hereto as A.
Defendant SMK, also represented by Mr. Herbert, appeared and answered
on April 14, 2004 [D14].  Mr. Herbert, however, did <u>not</u> answer the
Amended Complaint on behalf of the Laimer Defendants.  On May 24,
2004, the Laimer Defendants belatedly filed their initial disclosures
[D29], which contained general denials of each of the Counts of the
aversions in the Amended Complaint.  On June 24, 2004, Mr. Herbert
and the Laimer Defendants appeared and defended at the depositions of
two employees of Defendant Laimer Unicon, Elke Krantz and Patrick
Savio.  On June 28, 2004, Mr. Herbert and Defendant Laimer appeared
for Mr. Laimer's deposition.  On August 25, 2004, Mr. Herbert and
Defendant Laimer appeared at the deposition of Frank Ligori in Oak
Brook, Illinois.  Nearly eleven months later, on January 19, 2005,
Plaintiffs filed their Second Amended Complaint [D52] pursuant to a
Court Order [D51].  The Second Amended Complaint is identical to the
Amended Complaint except for the addition of an additional claim
(Count XI) for bad faith attorneys' fees that tracks the statutory
language of O.C.G.A. § 13-6-11.  <u>See</u> Exhibit A.  Mr. Herbert,
however, did not file an answer for <u>either</u> the Laimer Defendants or
Defendant SMK.  On February 28, 2005, Plaintiffs filed their Motion
for Default Judgment and Sanctions [D54].  On March 21, 2005, Mr.
Herbert belatedly filed two Responses to the Motion for Default
Judgment and Sanctions by Plaintiff [D58, D59].  On or about April 5,

2005, Mr. Herbert appeared for the deposition of Linda Lemmer (a third party), but she did not appear.  On April 19, 2005, Mr. Herbert appeared for Ms. Lemmer's rescheduled deposition.  On May 9, 2005, Defendant Laimer and Mr. Herbert appeared at the deposition of Rainer Dickhardt.[2]  On May 20, 2005, the Court entered its Order Granting Motion To Enter Default and Motion For Default Judgment [D68].  On May 25, 2005, John Patteson made an entry of appearance for the Laimer Defendants [D69].

From the beginning, the Laimer Defendants have clearly demonstrated an intent to defend this lawsuit.  After filing the Amended Complaint, Plaintiff litigated this case for a year without filing a motion for entry of default.  Indeed, as shown in Exhibit A neither of Plaintiffs' amended complaints alter the theory or the underlying allegations of Plaintiffs' case.  Accordingly, the Laimer Defendants, having answered the original Complaint and having generally denied the each of the claims in the nearly identical Amended Complaint in their Initial Disclosures, should not be penalized for failing to answer the Second Amended Complaint.[3]  See,

---

[2]    True and correct copies of cover sheets of deposition transcripts and subpoenas showing dates of depositions are attached at Exhibit B.

[3]    Notably, the Second Amended Complaint does not add any substantive allegations, because a claim for bad faith attorneys fees is held not to create a separate cause of action, but merely to provide an additional element of damages.  Gardner v. McKinney, 230 Ga. App. 771, 498 S.E.2d 312 (1998).

e.g., <u>Coyante v. Puerto Rico Ports Authority</u>, 105 F.3d 17, 23 (1st Cir. 1997)(proper exercise of discretion to refuse to enter a default for defendant failing to file an answer by deadline given that plaintiff took no action in response to defendants' failure to answer until more than two years had passed, and the defendants had already answered the Plaintiffs' initial complaint and amended complaint did not materially alter the plaintiff's theory of the case); <u>see</u> <u>also</u> <u>ABI Investment Group v. FDIC</u>, 860 F. Supp. 911, 914-15 (D.N.H. 1994) (though same lawyer represented two separate FDIC defendants and filed answer to amended complaint against first defendant but failed to file answer for second defendant, default not appropriate especially where the second defendant answered original complaint and amended complaint contained identical allegations).

The Laimer Defendants' failure to file an answer to either the First Amended Complaint or the Second Amended Complaint is solely and unquestionably due to the carelessness and neglect of Mr. Herbert. This is confirmed by Mr. Herbert's Affidavit (Laimer Defendants) filed in support of this Motion.  On Page 12 of the May 20 Order, this Court notes the totality of Mr. Herbert's conduct and openly ponders if "more than carelessness is at work" in the failure to respond to Plaintiffs' amended pleadings.  A careful reading of Mr. Herbert's Affidavit, however, belies such a concern.  There is nothing strategic or tactical about Mr. Herbert's actions.  What emerges is an amazingly consistent misapprehension of the Federal

Rules, local rules, and general mores of conduct in Federal Court. For example, if Mr. Herbert did not oppose a motion, he remained silent.  Mr. Herbert states that he did not respond to Plaintiffs' motion to dismiss the Laimer Defendants' counterclaim because he agreed with Plaintiffs' counsel's legal analysis in the motion. Herbert Aff. (Laimer) at ¶ 7.  Mr. Herbert failed to realize that a much better solution was dismissal of the counterclaim.  It would save the Court time and would demonstrate his participation and attention to the case.  Hindsight always reveals the clearest path.

Also remarkably consistent is Mr. Herbert's rationale for answering the amended pleadings on behalf of the Laimer Defendants. This is Mr. Herbert's first case in Federal Court.  He is much more accustomed to pleading practice in State Court where answers to amended pleadings are permissive, not mandatory.[4]  Accordingly, this explains what seems simply unexplainable:  why Mr. Herbert, who represented both SMK and the Laimer Defendants, answered the Amended complaint for SMK but did not answer for the Laimer Defendants. Applying Mr. Herbert's erroneous analysis, the answer is simple.  The Amended Complaint was a new pleading against SMK and required a response.  The Amended Complaint was an amended pleading against the Laimer Defendants and did not require a response.  This faulty logic

---

[4]     Under FRCP 15(a), "a party shall plead in response . . ." (emphasis added).  Under O.C.G.A. § 9-11-15, "a party may plead or move in response . . ." (emphasis added).

also explains why Mr. Herbert failed to answer the Second Amended Complaint for either SMK or the Laimer Defendants.  The Second Amended Complaint was an <u>amended</u> pleading to both parties, and Mr. Herbert believed that neither party was required to answer.  <u>Id.</u> at ¶ 30.  Although this conduct is amazingly careless, it nonetheless has a logical explanation.  Accordingly, it does not rise to the level of willfulness.  <u>See</u>, <u>e.g.</u>, <u>Mathon v. Marine Midland Bank, N.A.</u>, 875 F. Supp. 986, 992-93 (defendants, also lawyers, admitted several mistakes in their understanding of federal motion procedure which led to the default); <u>see</u> <u>also</u>, <u>Aetna Life Insurance Company v. Licht</u>, 2004 WL 2009410, *2 (S.D.N.Y. 2004) (attorney "conduct may be deemed 'willful' if it is 'egregious' or 'not satisfactorily explained.' Willfulness may be found where an attorney has 'thoroughly neglected' the client's case, but mere 'carelessness' will not suffice." [cits omitted]).  In addition, though this Court openly worried about Mr. Herbert's motives, his affidavit reveals no nefarious strategy or tactical purpose in failing to answer.  <u>See</u> <u>Fashion Fragrance & Cosmetics v. Croddick</u>, 2003 WL 1824638 (S.D.N.Y. 2003) (attorney neglect rising to the level of "staggering" not sufficient to warrant entry of default where there is no evidence in the record failures were "committed for strategic reasons or to gain some tactical advantage.")  Finally, Defendant Laimer, who is an Austrian Citizen and unfamiliar with the workings, rules, or procedures of a United States Court, completely and justifiably relied on Mr. Herbert.  <u>See</u>

Laimer Aff. at ¶ 93.  Mr. Laimer was not involved in the decisions about whether to respond to pleadings.  He believed that to be Mr. Herbert's area of expertise.  <u>Id.</u>  Defendant Laimer should not be penalized for his attorney's neglect.  Accordingly, the first factor weighs in favor of the Laimer Defendants.

### 3.   Factor 2 - There Will Be No Prejudice To Plaintiffs.

Since the Court has previously ruled in its May 20 Order that the second factor, prejudice to Plaintiffs, does not weigh in Plaintiffs' favor, it will not be addressed again here.

### 4.   Factor 3 - Defendants Have a Meritorious Defense.

The third factor considered is whether the Laimer Defendants can show a meritorious defense.  "The concern underlying [this factor] . . . is to determine whether there is some possibility that the suit will have an outcome different from the result achieved by the default."  <u>Phillips v. Weiner</u>, 103 F.R.D. 177, 182 (D.Me. 1984)(citation omitted).  Accordingly,

> to be a meritorious defense, it is not necessary that the response contain a winning defense.  Nor is it even necessary that the defense, even if proved, entitle the defendant to a judgment in his favor in all respects.  <u>In order to raise a meritorious defense for purposes of Rule 55(c) it is only necessary that the defendant raise justiciable issues for decision which are not totally frivolous</u> or bare allegations without foundation which if proved would entitle the defaulting party to partial relief.

<u>Cook v. Farrell</u>, 1975 WL 427, *2 (N.D.Ga. 1975).  The moving party must "plausibly suggest the existence of facts, which, if proven at

trial, would constitute a cognizable defense." <u>Coon v. Grenier</u>, 867
F.2d 73, 77 (1st Cir. 1989).  However, "[t]he movant need not
demonstrate a likelihood of success on the merits." <u>Gorski v. Dept.</u>
<u>of Corrections</u>, 204 F.R.D. 23, 26 (D.N.H. 2000).

As shown below, Mr. Laimer raises meritorious defenses to
Plaintiffs' claims.

**Count I - Patent Infringement.**

Plaintiffs' patent infringement claim alleges that the "Grand
Slam" and "Dredger" nozzles manufactured by Defendant SMK and sold by
Defendant SEC infringed on two patents held by KEG.  Second Amended
Complaint ("SAC") at   ¶¶ 46-49.  However, as set forth in the
Affidavit of Rainer Dickhardt, ("Dickhardt Aff.") the Grand Slam and
Dredger Nozzles have characteristics different from those asserted by
the KEG patents. Dickhardt Aff. at ¶¶ 16-17.  In a February 13, 2004
hearing, Plaintiffs sought emergency injunctive relief against the
Grand Slam nozzle and in favor of all of KEG's patents generally.
Exhibit C, hearing transcript at p. 2-3.  At the hearing, the Court
expressed a concern about "prior art" after being shown drawings of
nozzles with fluid mechanics similar to those patented by KEG.[5]  <u>Id.</u>
at 121-22.  The Court denied the request for injunctive relief by
stating that it was "not sufficiently confident that the plaintiff
can prevail on the infringement issue." <u>Id.</u> at 126.  This denial was

---

[5]     The Laimer Affidavit at ¶¶ 5-6 and Exhibits 3 and 5 and
        thereto provides evidence of the prior art on which the
        KEG patents were apparently reverse-engineered.

confirmed in the Court's February 17, 2004 Order [14].  In light of this ruling, a default should not be granted.  See Tellock v. Davis, 2003 WL 22999199 (D.N.Y. 2003) (court was "particularly reluctant to issue a default judgment in a case where it has been held that the plaintiff is not likely to succeed on the merits").  Accordingly, Laimer Defendants have presented evidence of a meritorious defense on this issue.

**Count II - False Advertising and Unfair Competition.**

In Count II, Plaintiffs allege a violation of the Lanham Act, 15 U.S.C.A. § 1125(a).[6]  See SAC at ¶ 52.  This claim revolves around a catalog SEC prepared and issued in limited quantities sometime after July 2003 ("First Catalog")[7] found at Exhibit 18 to the Laimer Affidavit and SEC's second catalog distributed in or about January 2004 (the "Second Catalog") .  See Laimer Affidavit at ¶¶ 84-85 and

---

[6]  KEG's allegation that Defendants used KEG's product names and product identification numbers refers to a quote sent by Mr. Laimer to the City of Carlsbad, NM on July 1, 2003 which listed two KEG products.  As set forth in the Laimer Affidavit at ¶ 86, Mr. Laimer had no nozzles to sell at the time.  His intent was to purchase a KEG nozzle from an existing distributor and resell it to the City of Carlsbad.  This sale, however, was never made.  Id.  Even it had occurred, such a sale would not give rise to a Lanham Act claim.  See Caterpillar, Inc. v. Nationwide Equipment, 877 F. Supp. 611, 615  (M.D. Fla. 1994)("unauthorized sale of a genuine trademarked product does not in itself constitute trademark infringement").

[7]  The First Catalog was sent to approximately 40 or fewer customers and was no longer in use as of January 2004. Laimer Aff. at ¶ 84.

at Exhibits 18 and 19.  Plaintiffs contend that the First Catalog violates the Lanham Act because it contains photographs of KEG products listed under Defendant SEC's product names.  Plaintiffs next contend that the First and Second Catalog (which does not contain any photographs of Plaintiffs' products) infringe on Plaintiffs' trade dress because of their similarities to Plaintiffs' catalog layout.

The critical inquiry in a Lanham Act claim "is whether it is likely that an appreciable number of ordinary prudent purchasers will be confused by the source of the goods." Essie Cosmetics v. Dae Do International, Ltd., 808 F. Supp. 952, 959 (E.D.N.Y. 1992).  Mr. Laimer admits that the First Catalog contained photocopies of the five KEG products.  Laimer Aff. at ¶ 83.  Though admittedly an error in judgment, it alone does not create a claim under the Lanham Act. Plaintiffs must still demonstrate a likelihood of confusion.  See, e.g., Ferraris Medical, Inc. v. Azimuth Corporation, 2001 WL 274817, *3 (D.N.H. 2001)(noting in case where evidence showed that Defendant used photographs of plaintiff's products in his catalog but designated them as originating from plaintiff, the likelihood of confusion would be the dispositive inquiry).

Several factors weigh against a likelihood of confusion in this case.  First, Frank Ligori, Aftermarket Parts Specialist for Vactor Manufacturing ("Vactor"), the world's largest manufacturer of sewer cleaning trucks, testified that he believed the KEG photographs in the First Catalog did not cause any confusion in the industry.

Exhibit D, Deposition of Frank Ligori at pp. 89-91.  Second, Mr.
Ligori explained that two KEG competitors, IBG and ENZ, "make very
similar nozzles, and actually, to be able to visibly see the
difference, you have to work with them on a day-to-day basis or you
have to set them side by side."  Id. at 91.  Accordingly, "[i]t's
very difficult for the average guy to look at a picture [of nozzles]
and tell them [sic] they're different."  Id. at 91-92.  Third, it is
standard practice in the sewer cleaning industry for distributors and
dealers to carry private label brands.  Thus, it is understood and
accepted that dealer catalogs will display nozzles made by other
manufacturers under dealer's product names.  Laimer Aff. at 88.
Beginning in 2003, KEG provided Vactor with private label nozzles
that were sold and marketed by Vactor under Vactor product names.
See Exhibit D, Ligori Deposition at p. 112-115; see also Vactor
catalog attached to Laimer Aff. at Exhibit 20.  KEG's current vice
president Barry Howell testified in the February 13, 2004 injunction
hearing, that Vactor was KEG's largest customer, accounting for
approximately forty to forty-five percent of KEG's sales.  See
Exhibit C at p. 40.  These factors create a meritorious defense on
Plaintiffs' Lanham Act claims.  See, e.g., Ferrari's Medical, Inc.,
supra, 2001 WL 274817, *3 (conflicting evidence on several factors
regarding likelihood of confusion precluded judgment as a matter of
law on issue); Cadbury Beverage v. Cott Corporation, 73 F.3d 474,
(2nd Cir. 1996) (private label sales precluded entry of summary

judgment on likelihood of confusion issue).

As to Plaintiffs' trade dress claims, Mr. Laimer directed the design, wording, and layout of the original KEG catalog while he was an independent contractor to KEG through Laimer Unicon, and there was no work made for hire agreement regarding the catalog. See Laimer Aff. at ¶ 13. The current KEG catalog was also designed by Mr. Laimer based on the original layout and is nearly identical in its product descriptions. Id. at ¶ 14. Accordingly, Mr. Laimer has a claim to the design, wording, and layout of the catalog, and he is entitled to use such design, wording, and layout. 17 U.S.C.A. § 201. At the TRO hearing, this Court focused on the copyright issue and observed that Defendant SEC's name is clearly marked on nearly every page of the Second Catalog.[8] The Court then refused to enjoin the SEC's use of the Second Catalog. See Exhibit C at p. 127; see also February 17, 2004 Order [D14]. There is no logical way to confuse defendant SEC's name with Plaintiff KEG's name. See Pampered Chef v. Magic Kitchen, Inc., (distinctively different name of competitor in large, bold font on cover of allegedly infringing catalog cast serious doubt on public confusion issue). The Laimer defendants have presented a meritorious defense on this issue.

**Count III - Computer Fraud and Abuse**

Count III comes under the Federal Computer Fraud and Abuse Act,

---

[8]     The First Catalog also clearly contains SEC names on each of the pages. See Laimer Affidavit at Exhibit 19.

14

18 U.S.C.A. § 1030(a) and involves Plaintiffs' allegations about a Dell Computer (the "Dell Computer") purchased by Mr. Laimer for the business. Though Plaintiffs vaguely claim "damage" to the Dell Computer, their claim centers around supposedly unauthorized use of this computer. See SAC at ¶ 57-58. A full and detailed discussion of the facts relating this computer is found in the Laimer Affidavit at ¶¶ 72-80. To have a claim under this statute, Plaintiffs must meet the threshold requirement that Defendants' access to the Dell Computer was "with the intent to defraud" and "without authorization" or "exceed[ed] authorized access." 18 U.S.C.A. § 1030(a)(4). As Mr. Laimer states, there was never any intent to defraud Plaintiffs and access was authorized at all times. Id. at 81. At no time prior to November 2003 did any KEG representative ever restrict access to the Dell Computer. Id. The only person who may have accessed the Dell Computer after November 2003 would have Mr. Laimer's young son who was visiting from Germany and may have used the Dell Computer to play video games. Id. Mr. Laimer's son apparently deleted these games later. Though this access may have been technically unauthorized, Plaintiffs' are hard pressed to claim that playing video games on the Dell Computer and later erasing them constitutes an "intent to defraud" KEG. Defendants have stated a meritorious defense to this claim.

### Count IV - Deceptive Trade Practices.

In Count IV, Plaintiffs allege a violation of the Uniform

Deceptive Trade Practice Act, O.C.G.A. § 10-1-372.  These allegations are identical to Plaintiffs' Lanham Act allegations in Count II. Compare SAC ¶ 51 and ¶ 60.  Since the Georgia Deceptive Trade Practices Act and the Lanham Act each require a showing of a likelihood of confusion, the Laimer Defendants incorporate the portion of this brief (along with the citations to Mr. Laimer's Affidavit) responding to the allegations of Count II as if fully set forth herein.

Although not pled in the Second Amended Complaint, Plaintiffs argue that on pages 7-9 of their Supplemental Brief in Support of Motion For Preliminary Injunction [D10] that Defendant SEC has misrepresented the fluid efficiency of its Grand Slam nozzle, thereby engaging in a deceptive trade practice.  As set forth in the Laimer Affidavit at ¶ 91, the efficiency characteristics for the Grand Slam set forth in the SEC catalog are based on his testing, industry knowledge, and experience.  Plaintiffs did not designate an expert on nozzle testing or efficiency during discovery; therefore, the only evidence that Plaintiffs are allowed to present at trial is testimony from a layman, like Mr. Laimer.  Conflicting testimony from two laymen creates a jury issue.  Accordingly, the Laimer Defendants have presented a meritorious defense on the Deceptive Trade Practices Act claims.

**Count V - Misappropriation of Trade Secrets.**

In Count V, Plaintiffs include a broad trade secrets claim under

O.C.G.A. § 10-1-761.  Plaintiffs claim protection for their
"computer, computer files, product samples, customer lists, financial
information, design drawings, pricing and profit information, and the
production elements and design layout of the KEG catalog."  SAC at ¶
64.  Plaintiffs attempt to bring all of these items under the purview
of the trade secrets statute by asserting "binding contractual
agreements between KEG, Laimer and Laimer Unicon."  Id. at ¶ 65.  The
only operative agreement in effect between these parties is the March
18, 2005 "Agreement to Terminate the Contract" between Mr. Hörger,
KEG, Mr. Laimer, and Laimer Unicon ("Termination Agreement").  See
Laimer Affidavit at Exhibit 17.  Page 2 of the Termination Agreement
expressly provides that "the previous contractual relationships are
to be finally stipulated and terminated by this Agreement."  The
Termination Agreement also contains the following confidentiality
provision:

> ... Mr. Laimer agrees to maintain silence towards
> third persons about all business transactions of
> KEG Technologies, Inc. he has become aware of in
> the course of collaboration.  Especially he must
> not use this knowledge for his own purposes or
> for third persons' purposes.  In the case of an
> offense, Mr. Laimer agrees to pay contractual
> penalty to the amount of $45,000.00.  It is left
> to KEG Technologies, Inc. to claim higher damage.
> [emphasis added]

Id.  Notwithstanding the unenforceable penalty provision, this
confidentiality clause is really a non-compete clause in disguise
because it contains no durational restriction on the non-disclosure.
The restriction goes on forever.  Under Georgia law, this clause

17

fails as a matter of law.  See, e.g., Amerigas Propane, L.P. v. T-Bo
Propane, Inc., 972 F. Supp. 685, 694 (S.D. Ga. 1997) (confidentiality
provision with no durational limitation void and unenforceable);
Equifax v. Examination Management Services, Inc., 216 Ga. App. 35,
435 S.E.2d 488 (1994)(same).

As to whether the claimed items are trade secrets, the focus "is
not on the actions of the Defendants, but upon the nature of the
information.  The inquiry simply boils down to the question: was this
information truly a secret?"  Penalty Kick Management, Ltd. v. The
Coca-Cola Company, 164 F. Supp.2d 1376, 1380-81 (N.D.Ga.
2001)(emphasis in original; internal cits. and quotations omitted).
Clearly product samples,[9] pricing, and the catalogue layout cannot be
secrets; they are the very marketing and sales tools used by KEG.
See Allen v. Hub Cap Heaven, 225 Ga. App. 533, 484 S.E.2d 259 (1997)
(alleged "secret" that is revealed to customers loses its protection
as a trade secret).  At the transition in late June 2003, the Laimer
Defendants turned over KEG's financial and sales information and
data, and the Laimer Defendants have neither retained nor used any of
it.  Laimer Aff. at ¶ 81.  There was no misappropriation here and
thus no claim for Plaintiffs.  See O.C.G.A. 10-1-761(2).

In Georgia, "a person who leaves the employment of another has a
right to take with him all the skill he has acquired, all the

---

[9]     Even though product samples are not a trade secret, Mr.
Laimer did not send any KEG samples to Defendant SMK.
Laimer Affidavit at ¶ 92.

18

knowledge he has obtained, and all the information he has received, so long as nothing is taken that is the property of the employer." Avnet, Inc. v. Wyle Laboratories, Inc., 263 Ga. 615, 618, 437 S.E.2d 302 (1993)(quoted authority omitted).  Accordingly, customers are not trade secrets, nor is the knowledge of their names and addresses. Id.  Defendant Laimer never possessed KEG's product drawings; he is not the manufacturer.  Laimer Aff. at ¶ 81.[10]  While preparing for this motion, Mr. Laimer learned from his counsel that documents produced to opposing counsel on May 9, 2005 contained a customer list of KEG.  In early April 2003, this list was faxed to Andreas Fein in Germany as part of the transition so Mr. Fein could notify KEG customers of the management change.  Laimer Aff. at ¶ 66.  Ms. Krantz inadvertently placed a copy of the customer list in the Mr. Fein's correspondence file.  Id. at 66.  Mr. Laimer did not know the list was in the file and never looked at the list after it was sent to Mr. Fein.  Id.  Although physical customer lists may sometimes qualify as a trade secret, it is not necessary to address this question because there has been no misappropriation or use of this list to the detriment of KEG.  See O.C.G.A. § 10-1-761 (1) and (2).  The Laimer Defendants have stated a meritorious defense on this claim.

**Count VI - Computer Theft, Trespass, and Invasion of Privacy.**

Count VI involves Plaintiffs' claim of Computer Theft, Computer

---

[10]  Obviously, the drawings in the KEG patents would not be trade secrets because Patents, by the very nature, are public documents.

Trespass and Computer Invasion of Privacy under O.C.G.A. § 16-9-93 (a)-(c). These claims are similar to the claims in Count III, i.e., unauthorized access is a threshold requirement. In the interest of brevity, the Laimer Defendants adopt and incorporate the portion of this brief (along with the citations to Mr. Laimer's Affidavit) responding to the allegations of Count III as if fully set forth herein. The Laimer Defendants have stated a meritorious defense to this claim.

### Count VII - Breach of Fiduciary Duties

Plaintiffs' breach of fiduciary duty claims in Count VII center around Plaintiffs' contentions that, while an officer of KEG, Mr. Laimer (1) competed with KEG by selling Buehler milling cutters, (2) took a corporate opportunity, i.e., the Vactor P-12 project, (3) made plans to start a competing business, and (4) improperly solicited KEG's biggest customer, Vactor.

**In General**. Mr. Laimer became Executive Vice President of KEG on July 1, 1999. Laimer Affidavit at ¶ 15. Mr. Laimer increased his involvement with KEG through a collaboration agreement in 2001. As part of this Agreement, KEG had asked Mr. Laimer to devote his efforts <u>exclusively</u> for KEG. <u>Id.</u> at ¶ 18. Mr. Laimer refused, agreeing only to mainly devote his energies to KEG. <u>Id.</u> Mr. Laimer made KEG profitable. There were barely any sales at all by Mr. Laimer's predecessor at KEG and no presence was established in the market at all. Laimer Aff. at 15. After Mr. Laimer began in 1999,

KEG sales (approximately) were as follows:

                    2000 - $207,284;
                    2001 - $335,154;
                    2002 - $572,056;
                    2003 - $442,549 (Jan. - June)

Laimer Affidavit at ¶ 89.  As explained in the Laimer Affidavit at ¶¶ 36-54, by the end of January 2003, Mr. Laimer and Mr. Horger's relationship had deteriorated beyond repair.  They met in Germany on March 18, 2003 to end the relationship.  Laimer Aff. at ¶ 63; see Exhibit 17 to Mr. Laimer's affidavit for a true and correct copy of the Termination Agreement.  Under the Termination Agreement, Mr. Laimer was no longer an officer of KEG as of April 30, 2003, and KEG and Laimer Unicon ended their independent contractor relationship on June 30, 2003.

**Buehler**.  In late 2001, Mr. Laimer started carrying the Buehler Line of milling cutters through Defendant Laimer Unicon.  See Laimer Affidavit at ¶¶ 23-29.  KEG did not carry milling cutters and prior to obtaining the Buehler Line, Mr. Laimer had asked Mr. Horger to manufacture them and he had refused.  Laimer Aff. at ¶ 24.  KEG carried chain root cutters.  Id.  Milling cutters are heavy duty items with far greater applications than a milling cutter.  Id. Indeed, companies typically purchase both products.  Id. Accordingly, Mr. Laimer increase sales for KEG because the Buehler line allowed access to existing Buehler customers who were not KEG customers.  Id. at ¶¶ 25, 28.  After learning of Buehler, Mr. Horger

was not happy.  He expressed his personal bias against the cutters,
but agreed they were not a competing product.  Id. at ¶ 27.  Laimer
Unicon sold milling cutters to Vactor.  Vactor also ordered chain
cutters from KEG but the quality was so terrible that Vactor decided
not to sell them.  Laimer Aff. at ¶¶ 48, 57; see also Exhibit D,
Ligori Deposition at pp. 218-221 and Exhibit 17 to Ligori Deposition
at Item 18.  After the chain cutter demonstration debacle at Vactor
that is set out in detail in the Laimer Affidavit at ¶¶ 47-52, Mr.
Ligori told Mr. Laimer that Vactor was not interested in purchasing
chain cutters from KEG.  Id. at ¶ 57.  Accordingly, in or about early
2003, Mr. Laimer began developing a prototype chain cutter attachment
for the milling cutter and he provided this item with Vactor.  Id. at
¶ 57.

     As set forth in his affidavit, Mr. Laimer never agreed to
exclusively represent KEG.  Laimer Aff. at ¶¶ 18.

> Corporate officers and directors, so long as they
> act in good faith toward their company and its
> associates, are not precluded from engaging in a
> business similar to that carried on by their
> corporation, either for their own behalf or for
> another corporation of which they are likewise
> officers or directors.  So long as he violates no
> legal or moral duty which he owes to the
> corporation or its stockholders, an officer or
> director is entirely free to engage in an
> independent competitive business.

Regenstein v. J. Regenstein Co., 213 Ga. 157, 97 S.E.2d 693 (1957).
The Buehler milling cutter is not a competing product.  Even if it
were, the addition of the milling cutter augmented Mr. Laimer's line

of KEG products, thereby increasing KEG's sales.  "It is well settled
that a claim for breach of fiduciary duty requires proof of three
elements: (1) the existence of fiduciary duty; (2) breach of that
duty; and (3) damage proximately caused by the breach."  <u>Griffen v.
Fowler</u>, 260 Ga. App. 443, 850, 579 S.E.2d 848 (2003).  Increased
sales and customer exposure as a result of Buehler helped KEG, not
hurt it.  Without damage there is no claim.  Further, even if the
chain cutter attachment to the milling cutter was a competing
product, KEG shot itself in the foot by manufacturing defective chain
cutters.  It cannot claim that Mr. Laimer or Buehler is the cause of
Vactor's decision not to buy the cutters.  The Laimer Defendants have
a meritorious defense to this claim.

**P-12 Penetrator Nozzle**.  While developing the relationship with
Vactor, Mr. Laimer learned that Vactor had a need for a penetrator
nozzle that Vactor wanted to call a P-12.  <u>Id.</u> at ¶ 44.  KEG
manufactured a type of penetration nozzle it called its Traction
nozzle.  <u>Id.</u>  Mr. Laimer had seen the Traction nozzle fail in
circumstances where a P-12 type nozzle would have succeeded.  He had
asked Mr. Horger to manufacture one of these nozzles and Mr. Horger
refused.  <u>Id.</u>  Because of this experience and Mr. Horger's difficulty
about the milling cutter.  Mr. Laimer did not bring the Vactor P-12
project to KEG; he approached Defendant SMK.  <u>Id.</u>  SMK developed a
prototype and Vactor tested it in or about March/April 2003.  Laimer
Aff. at ¶ 65.  After KEG and Mr. Laimer completely parted ways in

June 2003, Vactor continued to do business with KEG, but did not buy
any P-12 nozzles from Mr. Laimer.  Instead, Vactor began purchasing a
P-12 from a company called Shamrock and included this nozzle in its
"Blue Line" as the "Blue Penetrator" in its August 2003 Catalog.  See
Laimer Aff. Exhibit 20.  On January 23, 2004, nearly seven months
after Mr. Laimer's relationship with KEG, Vactor ordered 10 P-12
nozzles from Defendant SEC.  Laimer Affidavit at ¶ 92.

Mr. Ligori at Vactor testified that the P-12 was not a competing
product with KEG's traction nozzle.  Exhibit D, Ligori Depo. at p.
227.  This is further evidenced by the August 2003 Vactor.  In this
Catalog, the KEG Traction Nozzle (Vactor name "Penetrator) is
dislayed on the page opposite from the P-12 (Vactor name "Blue
Penetrator").  Furthermore, KEG clearly saw the Shamrock P-12
opposite its traction nozzle in the Vactor catalog, yet made no
attempt to capture this business.  Accordingly, Vactor's subsequent
purchase of the P-12 from Defendant SEC months later cannot be viewed
as a theft of a corporate opportunity.

**SMK.**  As stated above, Mr. Laimer met Defendant SMK while
working on the P-12 project.  At the time he began discussions with
SMK about the P-12 in early January 2003, Mr. Laimer's intention was
to develop the P-12 with the hopes that it might lead to other
specialty nozzles for Vactor which did not compete with KEG.  Laimer
Aff. at ¶ 46.  Those discussions, however, never materialized.  At
the end of January, 2003, for the reasons clearly set forth in Mr.

Laimer's Affidavit, Mr. Laimer's relationship Mr. Horger was essentially over.  Mr. Laimer then began discussions with SMK to develop a nozzle line to sell in the United States.  <u>Id.</u> at ¶¶ 61, 69.  Mr. Laimer placed orders for some of these nozzles prior to leaving KEG.  None of these nozzles, however, (with the exception of the P-12 prototypes) arrived in the United States for sale until after July 1, 2003, when Mr. Laimer was no longer affiliated with KEG in any way.  <u>Id.</u> at ¶ 69.

Under Georgia law, Mr. Laimer did not breach a fiduciary duty to KEG simply by making plans to enter into a competing business while he was still an agent of KEG.  <u>Investment Repair Service v. Gunby</u>, 238 Ga. App. 138, 518 S.E.2d 161 (1999).  He was "entitled to make arrangements to compete and upon termination of employment immediately compete."  <u>Id.</u>  In addition, simply because some KEG customers eventually began to purchase nozzles from SEC later in 2003 does not mean Mr. Laimer has taken a corporate opportunity.  <u>See</u> <u>e.g.</u>, <u>United Seal and Rubber Company v. Bunting</u>, 248 Ga. 814, 815-16, 285 S.E.2d 721 (1982) (ongoing relationship with a customer, even a large one, where there is no exclusive arrangement is not a corporate opportunity).  Mr. Laimer has asserted a meritorious defense to these claims.

**Vactor**.  Vactor was KEG's largest customer.  Mr. Laimer worked hard to develop the relationship and marketed KEG as a premium quality manufacturer.  <u>Id.</u> at ¶ 36.  KEG's first demonstration of a

camera system with Vactor was a failure.  Id. at ¶ 42.   KEG's
demonstration of the chain cutter was a failure.  Id. at ¶ 47-48.
KEG's first shipment of nozzles was a complete disaster.  Id. at ¶
49-51.  These quality issues caused a rift in the relationship
between Mr. Horger and Mr. Laimer.  Id. at ¶¶ 49-50.

      After Mr. Horger and Mr. Laimer agreed to part ways, Mr. Laimer
approached Vactor about the possibility of become a nozzle vendor for
Vactor when Mr. Laimer developed his own line.  Vactor refused and
continued to do business with KEG.  Laimer Aff. at ¶¶ 67, 90.  After
the relationship with KEG ended, KEG's products were included in
Vactor's catalog in August 2003.  See Laimer Affidavit at ¶90.[11]
Only on January 23, 2004, seven months after the relationship with
KEG ended, did SEC get a nozzle order from Vactor.  Laimer Affidavit
at ¶ 92.  Even if Mr. Laimer's solicitation of Vactor prior to June
30, 2003 was improper, KEG was not damaged by it.  For seven months,
KEG sold nozzles to Vactor while Mr. Laimer didn't.  After seven
months, one cannot be heard to cry foul.  There is no proximate cause
here, and thus no claim for breach of fiduciary duty.  The Laimer

_____

[11]     In this catalog, the following are all KEG nozzles
         (under Vactor names) Wedge (p.1); Penetrator (p.2);
         Power Cleaner (p.7); Super Flush (p.8); Turbo Rotator
         (p. 12); Chisel Point Wedge (p.13); Destroyer (p.14);
         Royal Flush Nozzle (p.15); and Tsunami Floor Cleaner
         (p.16).  Respectively, the KEG names for these nozzles
         are Quattro (p.1), Traction (p.2), Cleaning (p.7),
         Sewer (p.8), Rotor (p.12), Rambo (p.13), Torpedo
         (p.14), Royal (p.15), and Floor Cleaner (p.16).

Defendants have stated a meritorious defense to this claim.

**The Release**.  When Mr. Laimer and Mr. Horger met on March 18, 2003, Mr. Laimer owned thirty percent of the shares of KEG.  Save for a small distribution of approximately $3200.00 in 2001, Mr. Laimer had never received any value for his shares.  Mr. Horger informed Mr. Laimer at the March 18, 2001 "before I buy back the shares from you, I would rather fold up KEG and you can sue me and spend your attorneys' time and get nothing."  Laimer Affidavit at ¶ 63.  Facing the complete loss of his share value, Mr. Laimer negotiated a release by Mr. Horger and KEG of all past claims against him.  See Laimer Affidavit at Exhibit 17, item 8.

### Count VIII - Conversion

Plaintiffs' conversion claim essentially relates to the Dell Computer and to KEG product samples abandoned by KEG in the warehouse.  As set forth in Mr. Laimer's affidavit and discussed above, the Dell Computer was abandoned by Plaintiff KEG.  Nevertheless, the Laimer Defendants were always willing to give it to KEG and never exercised dominion and control over the Dell Computer to the exclusion of KEG.  See Laimer Affidavit at ¶¶ 78-80.  In addition, even though the computer was available to KEG, it waited until in or about January 2004 to retrieve the computer.  Id.  Mr. Laimer even helped KEG's office manager, Wanda, put the computer in the trunk of her car.  Id.

At the transition in late June 2003, Mr. Hörger and Dan Story

came to the warehouse in Marietta to retrieve all of KEG's belongings.  _Id._ at ¶ 74.  Mr. Hörger spent a great deal of time in the warehouse sorting through nozzles and inserts.  _Id._ Significantly, at that time, the _only_ nozzles in the warehouse were KEG nozzles.  _Id._  All nozzles were freely accessible; nothing was hidden or obscured.  _Id._  When finished, Mr. Hörger refused to sign a receipt for the items and inventory he took.  _Id._ at 75.  Mr. Laimer later discovered that Mr. Hörger had abandoned some KEG nozzles on the demo shelf.  _Id._  Mr. Laimer eventually sold some of these abandoned samples and the others remained in the warehouse.  _Id._ at 75.

Under Georgia law, "[a]n owner of property may abandon personal property by acts of commission or omission." _Walden v. Jones_, 252 Ga. App. 692, 694, 556 S.E.2d 566 (2001).  Further, abandoned property cannot be converted.  _See_ _Moultrie v. Wright_, 266 Ga. 30, 464 S.E.2d 194 (1995).  Mr. Hörger's actions during the transition create a factual issue whether the nozzles were abandoned. Defendants have stated a meritorious defense to the conversion claims.

**Counts IX - XI  Punitive Damages, Injunction, and Bad Faith**

Counts IX through XI state no separate causes of action.  Count IX for punitive damages depends upon a finding of liability on an underlying tort claim.  _See_ O.C.G.A. § 51-12-5.1.  Count X for injunctive relief also depends upon success on the merits.  Count XI for bad faith does not create a separate cause of action; it merely

provides an additional element of damages.  <u>Gardner v. McKinney</u>, 230 Ga. App. 771, 498 S.E.2d 312 (1998).  Since the Laimer Defendants have set forth a meritorious defense to each of the foregoing claims in Counts I through VIII, they have also set forth a meritorious defense to the claims in Counts IX through XI.

### 5.  Other Considerations Warrant Setting Aside Default.

"Other considerations that the Court may take into account are whether a substantial sum of money is involved, the good faith or lack thereof of the parties, and the timing of the motion to set aside the default."  <u>Phillips v. Weiner</u>, 103 F.R.D. 177, 179 (D.Me. 1984)(citations omitted).  The compensatory damages along in this case if a default is allowed to stand could we well into six figures. In addition, Plaintiffs seek treble and punitive damages and attorneys fees.  The amount at stake is significant.  As set forth in Section B., below, the Laimer Defendants have acted, and continue to act in good faith.  Finally, this motion to set aside default was brought as soon as practicably possible.

### B.  THE LAIMER DEFENDANTS HAVE NOT SHOWN A WILFUL DISREGARD OF THIS COURT'S ORDERS AND SHOULD BE SPARED THE HARSH SANCTION OF A DEFAULT JUDGMENT.

In the second part of its May 20 Order, this Court penalized <u>all</u> Defendants (i.e., the Laimer Defendants and Defendant SMK, who were jointly represented by Mr. Herbert) with a default judgment.  The Court focused on Mr. Herbert's negligent conduct, discussed above,

and emphasized what it considered <u>all</u> Defendants' "recalcitrance in the face of this Court's January 19, 2005 Order."

The Laimer Defendants respectfully state that they have not wilfully disobeyed this Court.  Defendant Laimer and his two employees at Defendant Laimer Unicon, Patrick Savio and Elke Krantz, all appeared for their noticed depositions.[12]  As to the January 19 Order compelling Mr. Savio answer his deposition questions, Plaintiffs never reconvened his deposition and cannot complain that the Laimer Defendants have abused the deposition process.  Mr. Savio is available to reconvene his deposition.  This deposition, however, may not be necessary.  Mr. Kurtz and Mr. Patteson have agreed that the Laimer Defendants will produce all sales ledgers and invoices for (i) all Buehler product sales, and (ii) all other SEC/Laimer Unicon sales from January 1, 2003 to the present.[13]  Plaintiffs' counsel will have these documents by June 24, 2005, allowing him sufficient time to focus on damages issues and to prepare for Mr. Laimer's reconvened deposition.  As set forth in recent letters between Mr. Kurz (Exhibit E) and Mr. Patteson (Exhibit F), the Laimer Defendants have promised

---

[12] Indeed, the parties, prior to Mr. Patteson's entry into this case, agreed to continue Mr. Laimer's deposition at a later date.  By agreement of counsel, that deposition is now scheduled for July 13, 2005, and Mr. Laimer will be deposed then.

[13] Since these documents will by their nature contain the names of all of the Laimer Defendant's customers, Plaintiffs may not feel the need to reconvene Mr. Savio's deposition because the only questions he had not answered dealt with the identity of customers.

to provide all available supporting SEC/Laimer Unicon sales documents which Mr. Kurtz needs for his analysis.

The January 19 Order required the Laimer Defendants to respond fully and completely to Plaintiffs' written discovery.[14] On May 9, 2005, while Plaintiffs' motion for default judgment was pending, Mr. Herbert served Plaintiffs with supplemental responses to Plaintiffs' discovery. This response included a document production. See Herbert Affidavit (Laimer) at ¶ 33. Mr. Herbert, in what again shows an amazingly consistent misapprehension of appropriate procedure, assumed that filing a certificate of service [D 65, D66] would alert the Court of his attempt to comply with the January 19 Order.[15] See Herbert Affidavit at ¶ 37. Mr. Herbert believes that he responded in good faith based on a previous meeting with Mr. Kurtz where discovery was discussed. Id. at 29. Mr. Kurtz disagrees that the responses are complete. See Exhibit E.

In their brief supporting the motion to compel, Plaintiffs expressly limited the motion's scope and did not complain that Plaintiffs had received incomplete responses to all interrogatories.

---

[14]    This discovery encompassed Plaintiffs' First Interrogatories To Defendants, Plaintiffs' First Request For Production of Documents, and Plaintiffs' Second Request For Production of Documents.

[15]    Although there is no real procedure here, since Mr. Kurtz had made an issue in his reply brief in support of the motion for sanctions that Mr. Herbert had not followed up on his March 16, 2003 letter, the better course of action would have been to notify the Court in a supplemental filing about his response.

31

See Motion to Compel [D 37] at pp. 6-15.  Notably, the majority of interrogatory responses which Plaintiffs sought additional responses request information on SEC's and Laimer Unicon's sales.[16]  As agreed by Mr. Kurtz and Mr. Patteson, Plaintiffs will have complete sales ledgers and invoices by June 24, 2005.  Under FRCP 33(d), when information responsive to an interrogatory may be derived from a document and the burden of deriving the information is the same on either party, reference to the document sufficiently answers the interrogatory.  Complete sales records go a long way toward satisfying Plaintiffs' discovery demands, and receiving this information at this time does not prejudice Plaintiffs.  On May 9, 2005, Mr. Herbert also supplemented the Laimer Defendants' answers to other interrogatories.[17]  After review of these responses, the Laimer Defendants' new counsel believes some minor supplementation may be desirable, and will undertake to review responses to all interrogatories and document requests immediately upon filing of this

---

[16]   The brief in support of the motion to compel expressly stated that "KEG ... seeks full and complete responses to the following interrogatories ... [5, 6, 10, 12, 13, 14, 19, 23, 25]."  Of these, interrogatories, Nos. 10, 12, 14, 19, and 25, seek sales data.  In addition, a large part of any answer to interrogatory No. 23 (solicitation of sales) can be derived from sales data.

[17]   The Laimer Defendants supplemented their responses to Interrogatories Nos. 5, 6 (by reference to documents as allowed) and 23.

motion.  Counsel will supplement any responses if necessary.[18]

Counsel respectfully submits that the Laimer Defendants' May 9, 2005 discovery responses, combined with the production of all sales records and invoices and the commitment to review and supplement discovery responses if and where necessary demonstrates a good faith effort to fully comply with the Court's January 19 Order.  Cf. Lakeside Bridge & Steel Co. v. Mountain State Construction, Co., 400 F. Supp. 273, 278-79 (E.D.Wisc. 1975)(defendant's failure to respond fully to interrogatories pursuant to court order is not a sufficient reason to enter sanction of default when defendant later supplemented responses which were not objected to by Plaintiff).

Mr. Herbert expresses his remorse at what has occurred in this case.  Out of his respect for this tribunal, he has given notice of his intent to withdraw as counsel for the Laimer Defendants.  In addition, and perhaps most importantly, Defendant Laimer, on whom the entire force of any default judgment would fall, states and affirms his complete respect for this tribunal and its orders, procedures, and rules.  Mr. Laimer states his full understanding of and

---

[18]   Of the interrogatory responses given by Mr. Herbert on May 9, Nos. 5, 6, 13, and 23 may need slight, but not major, supplementation.  Because of the overwhelming task involved in filing this motion and brief, new counsel for the Laimer Defendants has not had an opportunity to review all documents previously produced in this case.  Nor has counsel had the opportunity to discern if any documents were inadvertently overlooked. Counsel will perform this task immediately.

appreciation for the seriousness of what has happened and his lack of any intent to wilfully disobey any order or directive of this Court. He apologizes if any breakdown in communication between him and Mr. Herbert may have resulted in the delay or oversight in any production of a requested document, and he reaffirms his ongoing commitment to act with the utmost good faith and candor in these proceedings.

A default judgment is the harshest sanction and could easily ruin Defendant Laimer's life by destroying his business and his personal finances.  It could also result in his employees losing their jobs.  On close examination, the Laimer Defendants' conduct does not demonstrate wilful disregard of the Court and its orders. The Laimer Defendants have obtained new counsel who is cooperating fully with Plaintiffs' counsel and who understands, respects, and appreciates the Court's procedures and rules.  Plaintiffs will have the discovery they need and will be fully prepared for trial.  The Laimer Defendants respectfully request that this Court reconsider its drastic sanction and deny Plaintiffs' motion for default judgment and sanctions.

**CONCLUSION**

For the reasons set forth herein, the Laimer Defendants respectfully request that this Court enter the relief requested.

Respectfully submitted this 20th day of June, 2005.

[Signature on following page]

34

**BYRNE, DAVIS & HICKS, P.C.**

By: /s/John H. Patteson, Jr.
    John H. Patteson, Jr.
    Georgia Bar No.: 566530

Attorneys for the Laimer Defendants

Tower Place 100, Suite 1460
3340 Peachtree Road, NE
Atlanta, Georgia 30326
Phone: (404)364-1460
Fax: (404)266-7272

## CERTIFICATION

I hereby certify that this brief was typed in Courier New, 12 point as allowed by Local Rule 5.1 (C).

By: /s/John H. Patteson, Jr.
    John H. Patteson, Jr.
    Georgia Bar No.: 566530

## Certificate of Electronic Service

I hereby certify that the foregoing **BRIEF IN SUPPORT OF LAIMER DEFENDANTS' 55(c) MOTION TO SET ASIDE CLERK'S ENTRY OF DEFAULT AND MOTION FOR RECONSIDERATION OF ORDER GRANTING MOTION FOR DEFAULT JUDGMENT** document was served on opposing counsel through filing in the CM/ECF system.

This 20th day of June, 2005.

By: /s/John H. Patteson, Jr.
John H. Patteson, Jr.
Georgia Bar No.: 566530