**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| KEG TECHNOLOGIES, INC. and | : | |
| KURT HÖRGER, | : | |
| | : | CIVIL ACTION NO. |
| Plaintiffs, | : | 1:04-CV-0253-RWS |
| | : | |
| v. | : | |
| | : | |
| REINHART LAIMER, SEWER | : | |
| EQUIPMENT CORPORATION, | : | |
| LAIMER UNICON, LLC, an SMK | : | |
| ROHRSDÖRF GmbH, | : | |
| | : | |
| Defendants. | : | |

## <u>ORDER</u>

Plaintiffs KEG Technologies, Inc. ("KEG" or the "Company") and Kurt

Hörger initiated this suit in early 2004 against Defendants Reinhart Laimer

("Laimer"), Laimer Unicon, LLC ("Laimer Unicon"), and Sewer Equipment

Corporation ("SEC") (collectively, the "Laimer Defendants" or "Defendants").

They subsequently added SMK Rohrsdörf GmbH ("SMK") as a defendant.  In

the operative iteration of their Complaint, Plaintiffs assert claims for patent

infringement (Count I); false advertising and unfair competition under § 43(a)

of the Lanham Act, 15 U.S.C. § 1125(a) (Count II); violations of the Computer

Fraud and Abuse Act, 18 U.S.C. § 1030 (Count III); deceptive trade practices

under the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-

372(a) (Count IV); misappropriation of trade secrets (Count V); violations of

the Georgia Computer Systems Protection Act, O.C.G.A. § 16-9-93 (Count VI);

breach of fiduciary duties (Count VII); conversion (Count VIII); punitive

damages (Count IX); injunctive relief (Count X); and attorneys' fees (Count

XI).  (See Second Am. Compl. [52].)

On May 20, 2005, faced with Defendants' failure to respond to amended

pleadings, engage in discovery, or comply with orders compelling participation

in the discovery process, the Court held that Plaintiffs were entitled to a default

judgment in their favor, "in the form and amount to be determined . . . ."  (See

May 20, 2005 Order [68].)  The Court denied a subsequently filed motion to

reconsider.  (See Oct. 28, 2005 Order [105].)

Since that time, Plaintiffs entered into a settlement with Defendant SMK,

and agreed to dismiss SMK from this action with prejudice.  The extent of the

remaining Defendants' liability was the subject of a Rule 55(b)(2) hearing, held

2

May 15-16, 2006.  Having heard from the parties, the Court now considers the proper measures and forms of relief.

## Discussion

Despite the numerous claims asserted by Plaintiffs in their Second Amended Complaint, the causes of action upon which this Court is requested to award relief are few.  As an initial matter, Plaintiffs elected to voluntarily dismiss their claim for misappropriation of trade secrets at the outset of the damages hearing.  They also informed the Court that they did not intend to seek damages on their claims for violations of the Computer Fraud and Abuse Act and the Georgia Computer Systems Protection Act, stating that the sums they incurred to assess the damage to their computer systems would be sought in a forthcoming motion for attorneys' fees and expenses.  Plaintiffs additionally indicated that they sought only injunctive relief under the Georgia Uniform Deceptive Trade Practices Act, and that they would seek any damages associated with Defendants' conversion in the context of their claim for breach of fiduciary duties.

Consequently, at this juncture, the Court is asked to award damages only on Plaintiffs' claims for patent infringement, violation of the Lanham Act, and

3

breach of fiduciary duties.  Plaintiffs also seek injunctive relief.  The Court

addresses these requests below.[1]  It begins, however, by evaluating Defendants'

assertion that this Court's consideration of matters outside the pleadings in

connection with their prudential standing challenge resulted in a *de facto*

amendment of the Complaint, permitting them to now file a responsive pleading

and continue with this case unencumbered by the previous default.

## I.       The Court's Consideration of Matters Outside the Pleadings on the Issue of Prudential Standing Does Not Mandate the Allowance of a Responsive Pleading

After their default, but before the Rule 55(b)(2) hearing, Defendants filed

a motion to dismiss Plaintiffs' patent infringement claims, asserting that the

Court lacked subject-matter jurisdiction.  In particular, Defendants argued that

Plaintiffs' initiation of this suit without joinder of a patent co-owner resulted in

a prudential standing defect, and that this defect compelled the dismissal of

Plaintiffs' patent claims.

The Court, while agreeing with Defendants that non-joinder of a co-

owner presented a prudential standing issue, declined to dismiss Plaintiffs'

---

[1] Plaintiffs will be permitted to move for costs and attorneys' fees at a later date. <u>See</u> LR 54, NDGa.

patent claims on this ground.  (See May 10, 2006 Order [133] at 7-12.)

Observing that the Federal Circuit permits litigants to cure *prudential* standing

deficiencies after the commencement of litigation, see Intellectual Prop. Dev.,

Inc. v. TCI Cablevision of Ca., Inc., 248 F.3d 1333, 1348-49 (Fed. Cir. 2001),

the Court found that the declaration of the patent co-owner, Mr. Hans Lutze,

expressing his commitment to be bound by the outcome of this litigation, and

thus, assuaging concerns about multiple suits, rectified the initial failing in

prudential standing.  (Id. at 9-12.)[2]

Defendants now argue that, by considering Mr. Lutze's declaration (and

his subsequent assignment of his patent rights), this Court in effect permitted

Plaintiffs to amend their Complaint post-default.  The allowance of such an

amendment, Defendants continue, requires that the Court now permit them to

file an answer and continue with this litigation on the merits.  The Court

disagrees.

To be sure, this area of the law is not well-settled, and Defendants have

presented a colorable argument.  Indeed, they point out that in Intellectual

---

[2] The Court additionally noted that a proposed assignment of the patents to Mr.
Hörger, if effected, would likewise cure the deficiency.  The proposed assignment has
since been filed with the Court.  (See Assignment [141].)

5

Property Development, the decision upon which this Court based its holding, the "cure" to the prudential standing defect was accomplished by way of amendment to the plaintiff's pleading–namely, an amendment by the licensee adding the patent owner as a party.  248 F.3d at 1348.

But Federal Circuit precedent does not suggest to the Court an inflexible approach to remedying prudential standing deficiencies.  In Intellectual Property Development, for example, the Circuit emphasized "that even appellate-level amendments to correct jurisdictional defects may be appropriate . . . ."  Id. at 1348 n.15 (citing Mentor H/S, Inc. v. Medical Device Alliance, Inc., 240 F.3d 1016, 1019 (Fed. Cir. 2001)).  This flexibility, coupled with the fact that here, Plaintiffs' attempted "cure" did not take the form of an amendment adding a party or claim, but rather, an evidentiary showing that alleviated the concerns which support the prudential standing requirement, leads the Court to reject Defendants' challenge.  The default will stand.

## II.   Appropriate Relief

Having rejected Defendants' challenge, the Court next turns to consider the relief to which Plaintiffs are entitled.  In making this determination, the

6

Court accepts as true the well-pled factual allegations of the Second Amended Complaint.

### A.     Patent Infringement

Plaintiffs allege that Defendants, both directly and indirectly, infringed United States Patent Nos. 6,089,243 and 5,992,432 (the "KEG Patents").  These patents, which describe hydrodynamic tools for cleaning pipes and channels, are alleged to be "unique and significant assets of KEG because they provide for increased water flow efficiency through improved fluid mechanics as water passes through the nozzle, which in turn reduces water consumption and operating costs for customers."  (<u>See</u> Second Am. Compl. ¶ 16.)  Plaintiffs contend that these attributes give their nozzles a competitive advantage in the marketplace.  (<u>Id.</u>)

In their Second Amended Complaint, Plaintiffs identify as infringing products Defendants' "Grand Slam" and "Dredger" nozzles.  (<u>See</u> <u>id.</u> at ¶ 46.) They characterize, "[u]pon information and belief," Defendants' infringement as "willful."  (<u>Id.</u>)  At the May 15-16, 2006 Hearing, Plaintiffs sought as damages their "lost profits" arising out of this alleged infringement, prejudgment interest, and requested that the Court treble any award.

"In patent law, the fact of infringement establishes the fact of damage because the patentee's right to exclude has been violated." Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co., 895 F.2d 1403, 1406 (Fed. Cir. 1990). The patentee, however, must nevertheless "prove the amount of damage." Id. "If the record permits the determination of actual damages, namely, the profits the patentee lost from the infringement, that determination accurately measures the patentee's loss. If actual damages cannot be ascertained, then a reasonable royalty must be determined." Hanson v. Alpine Valley Ski Area, Inc., 718 F.2d 1075, 1078 (Fed. Cir. 1983); see also 35 U.S.C. § 284 ("Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.").

Here, Plaintiffs seek their "lost profits," claiming entitlement to $281,497, exclusive of interest or enhancement. They arrive at this figure by pointing to Defendants' sales of "Grand Slam" and "Dredger" nozzles, multiplying the quantity of sales by KEG's list price for comparable nozzles, and multiplying the result by their profit margin on each such nozzle. (See Pl.s'

8

Ex. 2.)  The Court finds this showing manifestly insufficient to sustain an award of lost profits.

"To recover lost profits, a patent owner must prove 'a causal relation between the infringement and its loss of profits.'  [Cit.]  More specifically, the patentee must show 'a reasonable probability that "but for" the infringing activity, the patentee would have made the infringer's sales.' "  Ericsson, Inc. v. Harris Corp., 352 F.3d 1369, 1377 (Fed. Cir. 2003); accord Water Techs. Corp. v. Calco, Ltd., 850 F.2d 660, 671-72 (Fed. Cir. 1988).  Although the means by which a patentee may make the required showing are not inflexible, such a showing necessarily entails a "reconstruct[ion]" of the applicable market through "sound economic proof[.]"  Ericsson, 352 F.3d at 1377.

In the instant case, there was no such reconstruction.  Plaintiffs simply assumed that every sale made by Defendants would have been theirs in the absence of the infringement.  But the evidence at the hearing (and, indeed, Plaintiffs' own stipulation) showed the sewer cleaning nozzle industry to be a highly competitive one.  It is not a two-supplier market where any sale made by one competitor can be presumed attributable to its opponent were it not for the infringement.  Cf., e.g., Lam, Inc. v. Johns-Manville Corp., 718 F.2d 1056,

1065 (Fed. Cir. 1983) ("Where, as here, the patent owner and the infringer were the only suppliers of the product, causation may be inferred.").  In the absence of any sound evidence respecting, *inter alia*, Plaintiffs' market share, the Court is simply left without the evidentiary foundation necessary to arrive at even a reasonably close approximation of Plaintiffs' lost profits.  See Water Techs. Corp., 850 F.2d at 671-72 (discussing Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152 (6th Cir. 1978), reiterated that a patentee seeking to prove that "it lost sales *equal in quantity* to the infringing sales" must typically show, among other things, the "absence of acceptable noninfringing substitutes" within the market) (emphasis in original).

Ordinarily, an inadequate showing *vis-a-vis* lost profits requires the Court to award the patentee a "reasonable royalty."  See 35 U.S.C. § 284.  "A 'reasonable royalty' necessarily involves some approximation of the market as it would have hypothetically developed absent infringement."  Riles v. Shell Exploration & Prod. Co., 298 F.3d 1302, 1311 (Fed. Cir. 2002) (citing Hanson, 718 F.2d at 1078).  While courts consequently enjoy the benefit of considerable leeway in ascertaining the value of such a royalty, see Golight, Inc. v. Wal-Mart Stores, Inc., 355 F.3d 1327, 1338 (Fed. Cir. 2004), the analysis nevertheless

10

demands "sound economic and factual predicates."  Riles, 298 F.3d at 1311; see also Transclean Corp. v. Bridgewood Servs., Inc., 290 F.3d 1364, 1376 (Fed. Cir. 2002) ("Transclean had the burden of proving the amount of reasonable royalty damages it is entitled to recover."); Unisplay, S.A. v. Am. Elec. Sign Co., 69 F.3d 512, 517 (Fed. Cir. 1995) ("Although th[e 'reasonably royalty'] analysis necessarily involves an element of approximation and uncertainty, a trier of fact must have some factual basis for a determination of a reasonable royalty.  Any rate determined by the trier of fact must be supported by relevant evidence in the record.").

Here, such proof is again absent.  Plaintiffs took the position at the Rule 55(b)(2) hearing that they were not seeking reasonable royalty damages, instead insisting on an award of treble lost profits.  That was their strategic choice to make.  But the Court is now left with a record that provides, at best, only a vague and incomplete understanding of Defendants' profit margin on the sale of their products in a market where available noninfringing alternatives appear to be rather ubiquitous.  In light of this paucity of evidence, the selection of a "reasonable royalty" rate would be an exercise in arbitrary speculation.  While the Court appreciates that its discretion in this area is quite broad, it has found

11

no support for the proposition that a reasonable royalty award can be the product of nothing more than guesswork.

In light of the absence of competent evidence supporting the award of either lost profits or a reasonable royalty, the Court is forced to make the difficult decision to deny Plaintiffs a monetary award on Count I of their Complaint.  See Lindemann, 895 F.2d at 1407 (citing with approval Devex Corp. v. Gen. Motors Corp., 667 F.2d 347, 363 (3d Cir. 1981), and the Third Circuit's affirmation of an "award of zero damages for lack of evidence[,]" reasoning: " 'The statute [35 U.S.C. § 284] requires the award of a reasonable royalty, but to argue that this requirement exists even in the absence of any evidence from which a court may derive a reasonable royalty goes beyond the possible meaning of the statute.' "); LG Elecs., Inc. v. Advance Creative Computer Corp., 212 F. Supp. 2d 1171, 1179 (N.D. Cal. 2002) (awarding no damages following defendant's default on patent infringement claim).[3]

---

[3] The Court is aware of those decisions, such as Riles, 298 F.3d at 1313, where the Federal Circuit, after holding proof of a reasonable royalty inadequate, remanded cases to the district court to determine an appropriate award.  It does not read such decisions, however, to permit a patentee-plaintiff to elect to initially forego reasonable royalties in favor of lost profits, and then obtain a "do over" hearing if its more aggressive pursuit proves unavailing.

AO 72A
(Rev.8/82)

That leaves the question of injunctive relief.  <u>See</u> 35 U.S.C. § 283.  Here, the default establishes that SEC's "Grand Slam" and "Dredger" nozzles infringe United States Patent Nos. 5,992,432 and 6,089,243.  (<u>See</u> Second Am. Compl. ¶¶ 12, 35, 44, 46.)  The fact that infringement was established in this case through default does not foreclose the availability of an injunction.  <u>See, e.g.,</u> <u>LG Elecs., Inc.,</u> 212 F. Supp. 2d at 1174 (enjoining infringement following default); <u>Roberts Metals, Inc. v. Fla. Props. Mktg. Group, Inc.,</u> 843 F. Supp. 1195 (N.D. Ohio 1993) (holding that permanent injunction entered following default was binding).  Nor does this Court's denial of preliminary injunctive relief have that effect.  <u>See</u> <u>MercExchange, LLC v. eBay, Inc.,</u> 401 F.3d 1323, 1339 (Fed. Cir. 2005), <u>rev'd on other grounds,</u> <u>eBay, Inc. v. MercExchange, LLC,</u> – U.S. –, 126 S. Ct. 1837, – L. Ed. 2d – (2006).

Were it operating under the traditional rule of the Federal Circuit that infringement typically mandates an injunction in all but the most extraordinary case, <u>see</u> <u>Richardson v. Suzuki Motor Co.,</u> 868 F.2d 1226, 1246-47 (Fed. Cir. 1989), this Court would be inclined to enjoin Defendants from the further manufacture or sale of the infringing nozzles, or devices no more than colorably different from those nozzles.  <u>See</u> <u>Int'l Rectifier Corp. v. IXYS Corp.,</u> 383 F.3d

13

1312, 1316 (Fed. Cir. 2004).  But, on the day of the Rule 55(b)(2) hearing in this case, the Supreme Court rejected that "general rule," and instead insisted that the lower courts grant or deny injunctive relief only if the plaintiff demonstrates:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

eBay, Inc., 126 S. Ct. at 1839.

In the instant case, the Court finds that the evidence of record adequately demonstrates satisfaction of the first and fourth elements of the foregoing test. But Plaintiffs did not show, and indeed, had little if any notice of the need to show, satisfaction of the remaining two elements, i.e., that a monetary award would be inadequate, and that the balance of hardships tips in their favor.

Because the Supreme Court issued its ruling on the day of the evidentiary hearing, the Court is not inclined to deny Plaintiffs injunctive relief on their patent claim based on the absence of such proof.  Rather, it finds that taking additional evidence and argument respecting the availability of injunctive relief,

14

or, for that matter, more equitable alternatives (<u>e.g.</u>, a compulsory license),

would be appropriate.  The parties are accordingly **DIRECTED** to confer, and

then to contact the Court to schedule a teleconference to discuss the manner in

which they wish to proceed.

### B.    Lanham Act Violations

Plaintiffs also allege that Defendants violated the Lanham Act, 15 U.S.C.

§ 1125(a), by "using photographs of KEG products, KEG product names and

descriptions, KEG product identification numbers, KEG's trade dress and the

production elements and layout of the KEG catalogue to sell, promote, and

advertise their products."  (<u>See</u> Second Am. Compl. ¶ 52.)  They seek a

monetary award under § 35(a) of the Lanham Act, which provides:

> When a violation . . . under section 1125(a) . . . shall
> have been established in any civil action arising under
> this chapter, the plaintiff shall be entitled, subject to
> the provisions of sections 1111 and 1114 of this title,
> and subject to the principles of equity, to recover (1)
> defendant's profits, (2) any damages sustained by the
> plaintiff, and (3) the costs of the action.  The court
> shall assess such profits and damages or cause the
> same to be assessed under its direction.  In assessing
> profits the plaintiff shall be required to prove
> defendant's sales only; defendant must prove all
> elements of cost or deduction claimed.  In assessing
> damages the court may enter judgment, according to

> the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount.  If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty.  The court in exceptional cases may award reasonable attorney fees to the prevailing party.

15 U.S.C. § 1117(a).

Critically, Plaintiffs' allegation of a Lanham Act violation, admitted by Defendants through their default, does not itself mandate monetary recovery. "Compared to the showing necessary to obtain an injunction, a higher standard of proof is required to recover damages[,]" or, for that matter, the defendant's profits.  4 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 27.42 (4th ed. 2006) (damages); Babbit Elecs., Inc. v. Dynascan Corp., 38 F.3d 1161, 1182 (11th Cir. 1994) (per curiam) ("In order to recover damages (apart from [defendant's] profits, [plaintiff] must demonstrate that it suffered actual damages.");[4] see also Bandag, Inc. v. Al Bolser's Tire Stores,

---

[4] "In deciding non-patent issues, such as trademark, trade dress and other unfair competition issues under § 43(a) of the Lanham Act, [the Federal Circuit] applies regional circuit law."  See Thompson v. Haynes, 305 F.3d 1369, 1374 (Fed. Cir. 2002).

AO 72A
(Rev.8/82)

Inc., 750 F.2d 903, 917 (Fed. Cir. 1984) ("[A]n injunction alone can, under appropriate circumstances, fully satisfy the equities of a given case, particularly in the absence of a showing of wrongful intent, [cits.], or upon an inconclusive showing that the actions complained of did in fact cause actual damage to the plaintiff."); Optimum Techs., Inc. v. Home Depot USA, Inc., No. 1:04-CV-3260-TWT, 2005 WL 3307508, at *2 (N.D. Ga. Dec. 5, 2005) ("The Eleventh Circuit Court of Appeals has determined that an accounting for profits is appropriate where: (1) the defendant's conduct is a deliberate and willful violation; (2) the infringer is unjustly enriched; or (3) the sanction is necessary for future deterrence.") (citing Howard Johnson Co., Inc. v. Khimani, 892 F.2d 1512, 1521 (11th Cir. 1990)).

Addressing first the availability of "damages sustained by the plaintiff" (and turning below to the issue of Defendants' profits), the Court concludes that Plaintiffs have not made a sufficient showing to permit such an award. Plaintiffs established a Lanham Act violation by proving (through default) that Defendants' practices were "likely to cause confusion" in the marketplace. (See Second Am. Compl. ¶ 53.) But in order to sustain a damages award predicated on injury *to them*, Plaintiffs were required to show more–namely, "actual

17

confusion" among consumers.  See, e.g., Web Printing Controls Co. v. Oxy-Dry Corp., 906 F.2d 1202, 1204-05 (7th Cir. 1990) ("A plaintiff wishing to recover damages for a violation of the Lanham Act must prove the defendant's Lanham Act violation, *that the violation caused actual confusion among consumers of the plaintiff's product*, and, as a result, that the plaintiff suffered actual injury, i.e., a loss of sales, profits, or present value (goodwill).  [Plaintiff] did not prove the elements essential to a recovery of damages, of course, so to it that avenue of relief is foreclosed.") (emphasis supplied).  Here, that showing has not been made.  Indeed, the record strongly suggests, and the Court finds, that Defendants' practices led to no actual confusion within the relevant marketplace.[5]  An award of actual damages would thus be improper.

---

[5] For example, the deposition of a representative of one of Plaintiffs' major (former) clients produced the following colloquy:

> Q:    You think this catalog that Mr. Laimer apparently sent to you and other people in the industry with photographs of KEG product caused any confusion in the industry?
>
> A:    Personally?
>
> Q:    Yeah.
>
> A:    No.

(Dep. of Frank Ligori at 91.)

The Court next turns to the propriety of an award in the form of Defendants' profits. <u>See</u> 15 U.S.C. § 1117(a) (providing for an award of defendant's profits). In contrast to actual damages, the award of a defendant's profits is not conditioned upon a showing of actual confusion. <u>See</u> <u>Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.</u>, 833 F.2d 1484, 1487-77 (11th Cir. 1987) ("A plaintiff need not demonstrate actual damage to obtain an accounting of an infringer's profits under section 35 of the Lanham Act."). Rather, such an award is appropriate where the plaintiff has been able to show, *inter alia*, that the defendant's violation was "deliberate and willful[.]" <u>See</u> <u>Optimum Techs., Inc.</u>, 2005 WL 3307508, at *2; <u>see also</u> <u>Babbit Elecs., Inc.</u>, 38 F.3d at 1182 ("Where the defendant's infringement is deliberate and willful, as in this case, an accounting for profits is proper under a theory of unjust enrichment."). Here, Plaintiffs made that allegation, and by defaulting, Defendants exposed themselves to an award of their profits. (<u>See</u> Second Am. Compl. ¶ 54.)

That said, the Court does not accept the argument that KEG is entitled to recover the entirety of Defendants' profits since the inception of the competing enterprise. Even taking the allegations of the Complaint as true, such an award

would result in an extraordinary windfall to the Company, in contravention of the Lanham Act's mandate that any monetary award "constitute compensation and not a penalty."  15 U.S.C. § 1117(a).  While "exactness is not required[,]" see Wesco Manuf., Inc., 833 F.2d at 1488, calculation of an award under the Act should not produce such a gross disconnect between harm and recovery.

Instead, the Court finds persuasive Defendants' argument that any award of profits should be limited to those profits they enjoyed as a consequence of selling certain misidentified products in an early SEC catalogue (that is, those four or five products bearing KEG's photographs and/or descriptions in a small number of advertising publications produced by Defendants) while copies of that catalogue were in circulation.   The evidence at the Rule 55(b)(2) hearing showed that such profits amounted to $15,126.16.  (See Def.'s Ex. 20.)  That amount, in the view of the Court, adequately compensates Plaintiffs for the Lanham Act violations identified in their pleading.

That leaves the issue of enhanced damages.  Section 35(a) of the Lanham Act vests district courts with considerable discretion to increase a monetary award, "according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount."  15

20

U.S.C. § 1117(a); Babbit Elecs., Inc., 38 F.3d at 1183 (emphasizing discretion

of the district court in determining the propriety of enhanced damages);

Optimum Techs., Inc., 2005 WL 3307508, at *4 (doing likewise); see also

Bandag, Inc., 750 F.2d at 917 ("Section 1117 confers a great deal of discretion

on a district court in fashioning a remedy . . . ."); 4 LOUIS ALTMAN, CALLMANN

ON UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES § 23.60 (4th ed.

2006) ("The discretion of the court [under § 35 of the Lanham Act] accordingly

extends both to the question of whether to assess exemplary damages and to the

choice of the multiplier as well.").  Plaintiffs argue that a treble award is

appropriate here.  The Court disagrees.

As an initial matter, it is doubtful whether treble *profits* are even

available under § 35(a) of the Lanham Act.  See Thompson, 305 F.3d at 1380

("By the terms of the statute, 'damages' are to be treated separately from

'profits.'  As for damages, the court may award up to three times actual

damages, depending on the circumstances of the case.  As for profits, however,

the court is not authorized to award up to three times the amount proved.  For

profits, the court is constrained to award the amount proved, subject only to an

adjustment, up or down, where the recovery would be otherwise unjust.");

ALTMAN, supra, at § 23:60 ("This provision authorizes trebling of plaintiff's damages, but does not authorize trebling the defendant's profits.").  But cf. Babbit Elecs., Inc., 38 F.3d at 1183 (citing 15 U.S.C. § 1117(a), stated, "The Court may, in its discretion, reduce or enhance the resulting award up to three times the amount of profits or damages, whichever is greater, as justice shall require.").[6]

Even putting that aside, however, the Court is left with the firm conviction that a treble award would be inappropriate on the facts of this case. Plaintiffs simply have not shown any actual harm arising from Defendants' unlawful acts.  See Babbit Elecs., Inc., 38 F.3d at 1161 ("Such an award is discretionary, but it may not be punitive, and must be based on a showing of actual harm."); Optimum Techs., Inc., 2005 WL 3307508, at *4 (stating likewise).  Moreover, while Defendants' acts may have been "intentional and willful" in the sense that Defendants consciously used sales materials, not their own, to market their products, their misappropriation appears to have sprung

_____

[6] While the Babbit Court cites § 1117(a) for this proposition, a careful reading of the decision shows that treble profits were actually awarded under § 1117(b) of the statute, governing counterfeit marks.  In contrast to subsection (a), subsection (b) expressly provides for the "[entry of a] judgment for three times such profits or damages, whichever is greater . . . ."  15 U.S.C. § 1117(b).

from haste rather than an intent to deceive the marketplace or capitalize on KEG's goodwill.

Turning next to the issue of equitable relief, see 15 U.S.C. § 1116(a), the Court finds that Plaintiffs have made a showing sufficient to sustain the issuance of an injunction.  By virtue of their default, Defendants admitted "using photographs of KEG products, KEG product names and descriptions, [and] KEG product identification numbers . . . to sell, promote, and advertise their products[,]" giving rise to the likelihood of confusion in the marketplace. (See Second Am. Compl. ¶ 52.)  Although Defendants appear to have suspended such uses at present, the Court appreciates that, were such practices to resume—perhaps this time on a broader scale—Plaintiffs' exposure to injury would be substantial.   Thus, the Court will enjoin Defendants from the further use of KEG product names, product descriptions, and product identification numbers, as well as of photographs of KEG products, to sell, promote, or advertise their products.[7]

_____

[7] Plaintiffs additionally make the allegation that Defendants employed KEG's trade dress and the production elements and layout of the KEG catalogue to sell, promote, and advertise their products.  At the evidentiary hearing, however, Plaintiffs failed to add specificity to these somewhat amorphous allegations, and the Court concludes that an injunction simply proscribing the use of KEG's "trade dress" or "catalogue layout" would run afoul of Rule 65(d)'s mandate that injunctions be reasonably specific.  See FED. R.

In sum, the Court finds an award of $15,126.16 to reflect the appropriate amount of compensation due Plaintiffs on their Lanham Act claim.  The Court further **ENJOINS** Defendants, their officers, agents, servants, employees, and those persons in active concert or participation with them, from further use of photographs of KEG products, KEG product names and descriptions, and KEG product identification numbers to sell, promote, and advertise their products.

### C.      Breach of Fiduciary Duties

Plaintiffs also assert that Mr. Laimer was a fiduciary of KEG, and owed fiduciary duties to KEG both prior to and following the termination of his agency in June of 2003.  They allege Mr. Laimer breached these duties by "engaging in acts in competition with KEG, soliciting KEG's customers, and misappropriating corporate opportunities of KEG for himself, Laimer Unicon and SEC while he was an officer, owner, employee, and agent of KEG"; "by misappropriating KEG's trade secrets and confidential information to manufacture knock offs of KEG's products, by failing to return this information to KEG upon his termination and by using KEG's catalogue and photographs to

---

CIV. P. 65(d) (requiring that injunctions "describe in reasonable detail . . . the act or acts sought to be restrained"); cf. also John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 984-85 (11th Cir. 1983) (finding similar injunction violative of Rule 65(d)).

sell Defendants' products"; and "by profiting out of the relationship with KEG

through the use of deception, misrepresentation, false advertising and unfair

competition."  (See Second Am. Compl. at ¶¶ 75-77.)

As a result of Mr. Laimer's alleged breach, Plaintiffs claim entitlement to

over $3 million, representing all revenues and compensation Defendants

received from 2001 to the present.  The Court finds this demand highly

excessive, both in view of the allegations of the Complaint and the evidence

presented at the Rule 55(b)(2) hearing.

To be sure, Georgia law provides for a generous recovery to claimants

able to prove a fiduciary breach.  See Harrison v. Harrison, 105 S.E.2d 214, 218

(Ga. 1958) (unfaithful agent is not entitled to retain any benefit or advantage

arising out of his breach); Jennette v. Nat'l Cmty. Dev. Servs., Inc., 520 S.E.2d

231, 235 (Ga. Ct. App. 1999) (claimant entitled to gross revenues flowing from

unlawful acts); Vinson v. E.W. Buschman Co., 323 S.E.2d 204, 206-07 (Ga. Ct.

App. 1984) (proper to award, *inter alia*, all compensation paid to unfaithful

agent during his unlawful competition).  But that generosity does not extend

beyond the durational boundaries of the defendant's malfeasance, or permit a

claimant to seize those benefits obtained by entirely lawful means.  See

25

Jennette, 520 S.E.2d at 235 (affirming award because it represented the "gross revenue received by [defendant] *from the diverted business*") (emphasis supplied); Vinson, 323 S.E.2d at 206-07 (affirming award because it represented "profits payable to [defendant] . . . plus all commissions paid to [him] *during . . . the period of the existence of the competing enterprise*") (emphasis supplied).  Here, the record simply does not support a disgorgement of all revenues and compensation dating back to 2001, nor can it sustain an award of all revenues received by Defendants after Mr. Laimer's departure from KEG.

As an initial matter, nothing in the Complaint suggests that Mr. Laimer breached his fiduciary obligations until around December 2002.  (See Second Am. Compl. ¶¶ 30-32.)  Notwithstanding Plaintiffs' argument to the contrary, moreover, the evidence presented at the hearing suggests no earlier breach.

Although Mr. Laimer did promote and sell Buehler "milling cutters" as early as 2001, the evidence overwhelmingly showed, and the Court finds, that those devices were not "competing products" with any product offered in the KEG line.  The milling cutters performed substantially different tasks than

AO 72A
(Rev.8/82)

KEG's chain cutters, and any overlap in their functionality was *de minimis*.[8]

Indeed, the Court finds that KEG knowingly acquiesced in the sale of such products until December 2002.  Until that time, Mr. Hörger discouraged their sale, not based on any perception that the devices were "competing products," or that Mr. Laimer's offering of Beuhler products ran afoul of his duties to KEG, but based on his personal dislike of the devices, and his belief that they were not as effective as chain cutters.  It was not until a December 19, 2002 letter, prompted largely by growing personal tensions between Mr. Hörger and Mr. Laimer, that Mr. Hörger forbade Mr. Laimer from offering the Beuhler line, for the first time purporting to invoke principles of exclusivity.

Rather, the Court finds that Mr. Laimer breached no fiduciary duty to KEG until December 2002.  It was at that time that he began, not simply *planning* to compete with his employer, but engaging in the active solicitation of business for his competing enterprise.  See, Gresham & Assocs., Inc. v. Strianese, 595 S.E.2d 82, 84-85 (Ga. Ct. App. 2004) ("[A] corporate officer does not breach fiduciary duties owed to the corporation simply by making

---

[8] The lack of any real competition between these two products most likely explains why Plaintiffs neglected to make any allegation respecting Defendants' Beuhler sales in their pleadings, despite having known of Defendants' dealings with the milling cutters for years.

plans to start a competing company while still employed by the corporation . . .

.  But during the term of employment with the corporation, the officer may not

solicit customers for a competing company or otherwise engage in direct

competition with the corporation's business."); see also Bacon v. Volvo Serv.

Ctr., Inc., 597 S.E.2d 440, 444 (Ga. Ct. App. 2004) (holding likewise)

Instrument Repair Serv., Inc. v. Gunby, 518 S.E.2d 161, 163 (Ga. Ct. App.

1999) (holding likewise).  Prior to that time, Plaintiffs have no claim to

Defendants' revenues and compensation.

What is more, the evidence does not support much of an award following

the termination of Mr. Laimer's association with KEG in June of 2003.  As a

general rule, former employees and corporate officers are free to engage in

competition with their previous employers.  See, e.g., S.E. Consultants, Inc. v.

McCrary Eng'g Corp., 273 S.E.2d 112, 115-16 (Ga. 1980) (stating rule); see

also Servicetrends, Inc. v. Siemens Med. Sys., Inc., 870 F. Supp. 1042, 1075

(N.D. Ga. 1994) (doing likewise).  But cf. Jennette, 520 S.E.2d 231, 234 (Ga.

Ct. App. 1999) (agent liable to return revenues obtained following purported

resignation when he continued to represent to clients that he was "affiliated"

with plaintiff).

28

In the instant case, KEG's claims of entitlement to revenues enjoyed by Defendants after Mr. Laimer's departure are, so far as the Court can tell, based on two distinct arguments. Plaintiffs first argue Mr. Laimer exploited his knowledge of KEG's trade secrets (including, *inter alia*, KEG's customer list) to generate business for his competing enterprise. In addition, they contend that Mr. Laimer misappropriated business opportunities belonging to KEG. After carefully considering the matter, the Court finds neither argument can sustain the requested award.

First, any claim for fiduciary breach resting on allegations that Mr. Laimer misappropriated trade secrets necessarily fails. The Georgia Trade Secrets Act supercedes virtually all common law theories of recovery predicated on trade secret misappropriation. See Penalty Kick Mgmt. Ltd. v. Coca Cola Co., 318 F.3d 1284, 1296-98 (11th Cir. 2003) (Georgia Trade Secrets Act superceded and preempted theories of recovery couched in terms of conversion, breach of confidential relationship and duty of good faith, unjust enrichment, and quantum meruit involving alleged trade secrets); Servicetrends, Inc., 870 F. Supp. at 1073 ("The Georgia Trade Secrets Act of 1990 . . . supercedes other civil remedies for misappropriation of a trade secret.); see also

<u>Opteum Fin. Servs., LLC v. Spain</u>, 406 F. Supp. 2d 1378, 1380 (N.D. Ga. 2005) (plaintiff not entitled to pursue other common law theories of recovery respecting information it alleged was a trade secret).  Moreover, assuming for the sake of argument that, contrary to the allegations of the Complaint, KEG's customer list did not constitute a trade secret, there was no duty attendant to Mr. Laimer's fiduciary status[9] precluding him from using that information in the pursuit of his competing enterprise, so long as those pursuits occurred after he left the Company.  <u>See</u> <u>Servicetrends, Inc.,</u> 870 F. Supp. at 1074 (former employee "was under no obligation to keep the skills and customer knowledge he acquired at [his former employer] confidential"); <u>Volvo Serv. Ctr., Inc.,</u> 597 S.E.2d at 443-44 (employee not liable for printing and taking customer list of former employer because it did not constitute trade secret).  Finally, while the evidence at the hearing showed some overlap between the customers appearing on the KEG list and those with whom Defendants did business, the Court finds the evidence at best inconclusive as to which of those customers Defendants pursued and obtained using the challenged information.  Indeed, the evidence at the hearing suggested that Mr. Laimer and his employees were not even aware

---

[9] While Mr. Laimer might have had certain contractual obligations *vis-a-vis* that information, Plaintiffs elected not to proceed on a breach of contract theory.

they were still in possession of the relevant list until after their attorney

happened upon it in preparing discovery responses.

Likewise, Plaintiffs' argument that Mr. Laimer misappropriated

"business opportunities" of KEG is insufficient to sustain a damages award in

the amount Plaintiffs seek.  The concept of business opportunity, as a matter of

Georgia law, is not an expansive one.  "A business opportunity arises from a

'beachhead' consisting of a legal or equitable interest or an 'expectancy'

growing out of a pre-existing right or relationship."  Mau, Inc. v. Human

Techs., Inc., 619 S.E.2d 394, 397 (Ga. Ct. App. 2005) (quoting United Seal &

[Rubber ] Co. v. Bunting, 285 S.E.2d 721 (Ga. 1982)).  Indeed, in United Seal,

the Georgia Supreme Court held that even a "long standing" pre-existing

relationship is insufficient to constitute a business opportunity absent a

contractual relationship, an "exclusive arrangement," or a "finite aspect."  See

285 S.E.2d at 723; compare S.E. Consultants, Inc., 273 S.E.2d at 118 (business

opportunity existed where company had done preliminary work and was invited

to make bid on finite project).  Outside of this relatively constrained definition

of "business opportunity," the Georgia courts have repeatedly emphasized that

an employee is free to take business that would, in all likelihood, have

otherwise belonged to his former employer.  See, e.g., Instrument Repair Serv., Inc., 518 S.E.2d at 164; see also Gresham & Assocs., Inc., 595 S.E.2d at 85.

Plaintiffs allege, and the Court must accept, that Mr. Laimer did misappropriate some "business opportunities" of KEG.  But with the exception of sales by Mr. Lamier and SEC to Vactor Manufacturing, Inc. ("Vactor") in January and March of 2004 (around the time KEG voluntarily terminated its relationship with Vactor), which the Court also concludes directly resulted from Mr. Lamier's unlawful solicitation occurring prior to the termination of his agency, the evidence presented at the Rule 55(b)(2) hearing did not identify any such opportunities upon which the Court could attribute an improper gain to Mr. Laimer, or a loss to Plaintiffs.  Cf. Jennette, 520 S.E.2d at 235 ("As plaintiff, NCDS had the burden of proving its damages with reasonable certainty.  [Cit.]  The factfinder must be able to calculate the amount of damages from the evidence presented, since an award may not be based upon guesswork.").  Those sales, totaling $19,927.50,[10] represent the only revenues of Defendants to which Plaintiffs are entitled following the cessation of Mr. Laimer's agency with KEG.

_____

[10] The revenues associated with these sales initially totaled approximately $29,000, but Vactor returned about $9,000 worth of merchandise for a refund in April of 2005.

Consequently, Plaintiffs are entitled to the revenues Mr. Laimer and SEC enjoyed as a result of those sales with Vactor, as well as the compensation and benefits Mr. Laimer received, through Laimer Unicon, between December 2002 and June 2003.[11]  Taking into account the car allowance and insurance reimbursement provided to Mr. Laimer (which the Court finds to be in the nature of benefits, provided to Mr. Laimer for both business and personal use), his compensation and benefits for the relevant period total $40,075.00.[12]  This brings Plaintiffs' damages on their breach of fiduciary duty claim to $60,002.50.

Plaintiffs have additionally alleged that Defendants' unlawful activities "constitute[ ] willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference

---

[11] Although the Court would also be inclined to award Plaintiffs SEC's gross revenues during the relevant time period, Plaintiffs have not identified such amounts with reasonable certainty.   Rather, Plaintiffs submitted evidence showing only SEC's aggregate revenues for the entire 2003 calendar year.  The state of the record makes it impossible to ascertain what revenues SEC enjoyed, if any, during Mr. Laimer's tenure with KEG, and as such, any award of SEC's revenues would be inappropriate.

[12] The Court excludes from this total the "Ex[p]ense Allowance," "Fax Fees," and "Contract Labor" fee that Laimer Unicon received from KEG during the period at issue. Those amounts reflect reimbursement for expenses Laimer Unicon incurred in the course of carrying out KEG's business, and do not constitute "compensation" paid to Mr. Laimer.

33

to the consequences[,]" and claim entitlement to a punitive award.  (See Second Am. Compl. ¶ 85.)  Plainly, the breach of a fiduciary's duties can sustain such an award, see Kilburn v. Young, 569 S.E.2d 879, 883 (Ga. Ct. App. 2002), and the Georgia courts have made clear that punitive damages following a defendant's default may be proper.  See, e.g., Wise Moving & Storage, Inc. v. Rieser-Roth, 578 S.E.2d 535, 536-37 (Ga. Ct. App. 2003); K-Mart Corp. v. Hackett, 514 S.E.2d 884, 887-89 (Ga. Ct. App. 1999).  In this case, moreover, the Court finds that the record supports some punitive recovery, as Mr. Laimer's solicitation of KEG customers for a competing enterprise during the tenure of his employment demonstrated the type of willful misconduct contemplated by O.C.G.A. § 51-12-5.1(b).

The question of an amount, however, is more difficult.  The purpose of a punitive award is to "to punish, penalize, or deter a defendant[,]" O.C.G.A. § 51-12-5.1(c), and the propriety of any award must be evaluated "in its unique context, in light of the facts of the case and with reference to the actual damages awarded and the potential harm that could have resulted from the defendant's conduct."  Time Warner Entm't Co. v. Six Flags Over Ga., LLC, 563 S.E.2d 178, 185 n.9 (Ga. Ct. App. 2002).  As stated earlier, Defendants' conduct

exhibits a willful disregard of KEG's rights sufficient to sustain a punitive

recovery.  But, the Court is not persuaded that those acts were calculated to

harm Plaintiffs, and Defendants appear to have taken some steps to avoid the

actual consummation of competing "deals" during Mr. Laimer's tenure with

KEG.  Moreover, Defendants' competing enterprise is not a robust operation,

and has been suffering a considerable loss of business ever since default was

entered in this case.  As a consequence, a punitive award of any significant

magnitude is sure to have a material deterrent and punitive impact.

In light of the foregoing, the Court finds a punitive award equal to 50%

of Defendants' underlying liability on the breach of fiduciary claim sufficient

and appropriate to achieve the aims of O.C.G.A. § 51-12-5.1.  Thus, in addition

to the actual damages of $60,002.50, the Court finds that Plaintiffs are entitled

to a punitive award of $30,001.25, bringing the total damages on Counts VII

and IX of the Second Amended Complaint to $90,003.75.  The Court is not

persuaded, however, that Plaintiffs are entitled to any injunctive relief in

connection with this claim.[13]

---

[13] The Court reaches this conclusion after careful examination of the allegations
supporting Plaintiffs' claim for fiduciary breach.  Plainly, the Court can no longer enjoin
Mr. Laimer from engaging in unlawful competition "while he *was* an officer, owner,
employee and agent of KEG." (<u>See</u> Second Am. Compl. ¶ 75) (emphasis supplied).

### D.    Remaining Claims

The foregoing discussion resolves Plaintiffs' claims for damages, with

the exception of their request for costs and attorneys' fees,[14] which they have

elected to seek following the entry of this Order.  What remains are requests for

_____

Likewise, the acts of malfeasance constituting unfair competition and false advertising have already been enjoined in connection with Plaintiffs' Lanham Act claim, and no further injunction need issue.

That leaves only the allegations that Mr. Laimer retained and exploited KEG's trade secrets and confidential information to his own ends, and that he misappropriated KEG's business opportunities.  As to the first allegation, the unavailability of an injunction necessarily follows from the analysis above.  The Georgia Trade Secrets Act preempts virtually all other common law theories predicated on misuse of trade secrets, and, were the information at issue *not* deemed a trade secret, the Court has not been directed to any Georgia authority making Mr. Laimer's retention of it unlawful.  As to the second, related to the appropriation of business opportunities, the Court found no authority permitting the imposition of a generalized injunction foreclosing the misappropriation of all corporate opportunities existing at the time of an officer's departure.  To the contrary, the Federal Rules, the Georgia Code, and applicable precedent would seem to make the identification of a specific, identifiable, prospective opportunity a prerequisite to injunctive relief.  See FED. R. CIV. P. 65(d) (requiring that injunction "be specific in terms [and] . . . describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained"); O.C.G.A. § 14-2-831(a)(2) (permitting court to "[t]o enjoin a proposed unlawful conveyance, assignment, or transfer of corporate assets or other unlawful transaction[,]" including the misappropriation of a business opportunity, "where there is sufficient evidence that *it* will be made") (emphasis supplied); S.E. Consultants, Inc., 273 S.E.2d at 118 (enjoining misappropriation of a specific business opportunity).  Here, no such identification has been made.

[14] Plaintiffs informed the Court that they intend to seek damages incurred on their Computer Fraud and Abuse Act and Georgia Computer Systems Protection Act claims, which they state take the form of expert fees, in their motion for attorneys' fees.

injunctive relief under the Georgia Uniform Deceptive Trade Practices Act and the Federal Computer Fraud and Abuse Act.[15]

Plaintiffs' allegations in support of their claim under the Georgia Uniform Deceptive Trade Practices Act are in all material respects identical to those made in support of their Lanham Act claim. Because the injunctive relief to which Plaintiffs would be entitled under this claim is in no way different from that which they have already obtained under the Lanham Act, the provision of further injunctive relief is unnecessary.

As it relates to the Computer Fraud and Abuse Act claim, it is Plaintiffs' contention that Defendants "accessed the KEG Computer without authorization and caused the copying and transmission of information from the computer and its files." (See Second Am. Compl. ¶ 58; see also id. at ¶¶ 56 & 58 (alleging statutory requisites to suit)). They identify among the misappropriated files those "containing KEG's customer lists, financial information, design drawings,

---

[15] It is doubtful whether the Georgia Computer Systems Protection Act provides for equitable relief. See O.C.G.A. § 16-9-93(g) (authorizing civil suit for damages; continuing, "[t]he provisions of this article shall not be construed to limit any person's right to pursue any additional civil remedy otherwise allowed by law"). Resolution of this matter is unnecessary at this juncture, however, because any relief to which Plaintiffs might be entitled under the Georgia Act is likewise available under the Federal Computer Fraud and Abuse Act.

AO 72A
(Rev.8/82)

product orders, profit margins, pricing information, and catalogue production

elements and layout."  (<u>Id.</u> at ¶ 42.)  The Computer Fraud and Abuse Act

plainly authorizes injunctive relief to remedy its violation.  <u>See</u> 18 U.S.C. §

1030(g) ("Any person who suffers damage or loss by reason of a violation of

this section may maintain a civil action against the violator to obtain

compensatory damages and injunctive relief or other equitable relief.").

Finding the issuance of injunctive relief appropriate here, the Court hereby

**ENJOINS** Defendants Reinhart Laimer, Laimer Unicon, LLC, and Sewer

Equipment Corporation, their officers, agents, servants, employees, and those

persons in active concert or participation with them, from further accessing the

computers of KEG Technologies, Inc. without the latter's authorization, and

**DIRECTS** Defendants to destroy, within thirty (30) days of this Order, all

computer files so obtained from the KEG Computer, as well as any copies

thereof, regardless of whether those copies are now in electronic or paper form,

insofar as such files or copies remain within Defendants' possession, custody,

or control.

AO 72A
(Rev.8/82)

**Conclusion**

The Court finds that default judgment should be entered against Defendants Reinhart Laimer, Laimer Unicon, LLC, and Sewer Equipment Corporation, and in favor of Plaintiff KEG Technologies, Inc., in the amount of $105,129.91.  In addition, Defendants Reinhart Laimer, Laimer Unicon, LLC, and Sewer Equipment Corporation, their officers, agents, servants, employees, and those persons in active concert or participation with them, are hereby **ENJOINED**:

(i) from further use of photographs of KEG products, KEG product names and descriptions, or KEG product identification numbers to sell, promote, and advertise their products; and

(ii) from further accessing the computers of KEG Technologies, Inc. without the latter's authorization.

The Court further **DIRECTS** Defendants to destroy, within thirty (30) days of this Order, all computer files obtained from the KEG Computer without KEG's authorization, as well as any copies thereof, regardless of whether those copies are now in electronic or paper form, insofar as such files or copies remain within Defendants' possession, custody, or control.

The Court **RESERVES RULING** as it relates to the propriety of injunctive relief on Plaintiffs' claim for patent infringement.  The parties are **DIRECTED** to confer, and then to contact the Court to schedule a teleconference to discuss the manner in which they wish to proceed in light of the Supreme Court's recent decision in <u>eBay, Inc. v. MercExchange, LLC</u>, – U.S. –, 126 S. Ct. 1837, – L. Ed. 2d – (2006).

Plaintiffs shall have the opportunity to seek costs and fees in compliance with the Local Rules of this Court.

**SO ORDERED** this  8th  day of June, 2006.


RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)